WILLIAMS, ET AL. *v.* THE ASSOCIATED PRO-
FESSORS OF LOYOLA COLLEGE IN THE
CITY OF BALTIMORE, ET AL.

[No. 222, September Term, 1969.]

*Decided March 12, 1970.*

*Motion for rehearing filed April 13, 1970; denied May 4, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN and DIGGES, JJ. and RIDGELY P. MELVIN, JR., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Donald N. Rothman* and *Evan A. Chriss,* with whom was *Robert E. Sharkey* on the brief, for appellants.

*Robert L. Karwacki,* with whom was *Daniel B. Leonard* on the brief, for The Associated Professors of Loyola College in the City of Baltimore, et al., part of appellees.

Submitted on brief by *Francis B. Burch, Attorney General,* and *Jon F. Oster, Assistant Attorney General,* for the Board of Liquor License Commissioners of Baltimore City, other appellee.

BARNES, J., delivered the opinion of the Court.

The appellants, Dr. M. Lee Williams, and others, own their homes adjacent to the property 4603 Millbrook Road in Baltimore City, which is improved by the "Millbrook House" owned by The Associated Professors of Loyola College in the City of Baltimore, one of the appellees (Loyola). The Loyola College Alumni Association

(Alumni Association) obtained a Class "C", seven-day beer, wine and liquor license from the Board of Liquor License Commissioners of Baltimore City, another appellee (the Board), granted on September 23, 1965, and issued on February 10, 1966, in order to establish a "rathskeller" in the basement of Millbrook House for use of the Alumni Association, its members, the faculty of Loyola and their guests. The appellants, as plaintiffs below, filed a bill of complaint in the Circuit Court of Baltimore City against the appellees already mentioned and others, to declare, *inter alia*, that the liquor license was illegally and improperly granted by the Board and is null and void and, further, to enjoin both the Board from issuing a license until all legal requirements have been met and the Alumni Association and its officers and employees from operating the rathskeller until a legal and proper liquor license has been granted. The Circuit Court of Baltimore City (Dorf, J.) dismissed the bill of complaint and this appeal presents the issues arising in regard to the propriety of that dismissal.

The Millbrook House property consists of a large lot with approximate dimensions of 360 feet by 234 feet. It is located on Millbrook Road, a public street of Baltimore City some 40 feet in width. Prior to its purchase in 1958 by Loyola, it was directly across Millbrook Road from the college campus. It is located in a Residential Use, F area and 40 foot height zone and is improved by a large three story and basement stone building, used at the time of the purchase as a multiple dwelling house with several families as tenants. Immediately following the purchase of the property, Loyola converted the first and second floors of the building to offices for the college faculty, seminar rooms, offices for the Alumni Association and several small classrooms. The basement of the building continued to be used, in part, for residential apartments until the early part of 1965.

At the time this case was tried in the lower court, the stone building was completely used by Loyola for various college purposes. Its various rooms were used for semi-

nars, administration offices, faculty offices, Alumni Association offices and an Alumni clubroom, which includes the rathskeller in the basement. The renovations necessary to change the building's character as a residential apartment house to a college administration building occurred over a period of years after its acquisition by Loyola. From time to time as the renovations occurred, Loyola applied to the Bureau of Building Inspection of Baltimore City for the necessary building permits, through the various contractors who were making the renovations for the college. The applications for these permits and some of the subsequent permits indicate that Millbrook House was used for alumni or college purposes. Also during this period, Loyola had Millbrook House inspected by the Bureau of Building Inspection each year, such annual inspections being required for buildings in Baltimore City used for public gatherings.

The idea to renovate the basement at Millbrook House as a meeting place for alumni activities and for interrelated activities of the faculty and alumni was conceived in 1965. The officers of Loyola and the officers of the Alumni Association agreed that this renovation should be made, in order to permit a more active participation by the alumni at the college. To further and implement this plan, an application for a Class C, seven-day beer, wine and liquor license was submitted to the Board on August 25, 1965. The named applicants were James L. Fisher, John C. Byrnes and Martin F. Knott, officers of the Alumni Association, all residents of Baltimore City.

Before the application could be filed with the Board, it was required to be submitted to the Zoning Division of the Bureau of Building Inspection for its approval in regard to the zoning of the property. This was done and the application was returned to the Board endorsed "residential-approved for private club." Thereafter, Joseph Van Collom, Jr., who has been executive secretary of the Board since 1950 and who is a member of the Maryland Bar, advertised the application for the Class C beer, wine and liquor license applied for, pursuant to Article 2B of

the Code (1957, 1968 Repl. Vol.), as amended, in the daily newspapers in Baltimore City, *i.e., The Sun, The News American* and *The Daily Record.* These advertisements stated that the premises for which the license was being sought was 4603 Millbrook Road. Mr. Van Collom also gave specific directions to Inspectors Downey and Johnson, who were assigned the duty of inspecting the property and interviewing the applicants, to post *two* signs advertising the application for this property (rather than the customary *one* sign) because, as Mr. Van Collom stated in his testimony, he knew that the property sat back from a side street of a main thoroughfare and he wanted to insure conspicuous notice of the application to residents in the area. In accordance with these instructions, the two inspectors posted one of the *red* notice signs at the front entrance door of Millbrook House and the second red sign of the same size (approximately 18 inches by 14 inches) at the intersection of Cold Spring Lane and Millbrook Road. The second sign was on a stand located within an open mesh wire fence which stands four feet off the right of way at this intersection. Both signs described the type of license, the name of the applicant, the time and place of the hearing and the location where the license would be used (4603 Millbrook Road). They both remained posted for a period of 10 days.

In the course of reviewing the application, Mr. Van Collom observed that John C. Byrnes, one of the applicants, was a law student. He suggested to counsel then representing the Alumni Association that he thought it would be better not to have a law student as one of the licensees because of the constant danger to a licensee of vicarious criminal liability for violation of the liquor laws, which might prejudice the law student before the Character Committee of the Court of Appeals when that Committee passed upon his character and petitions for admission to the Bar. Accordingly, Maurice S. Bozel, another officer of the Alumni Association, was substituted as a proposed licensee for John C. Byrnes. Mr. Van Col-

322

lom testified in the lower court that it was the administrative practice of the Board where only one of the three applicants for a club or corporate license was changed after the application had been filed with the Board not to require a re-advertisement of the application, and, further, that this administrative practice had been in effect since 1947.

The Board received no protests against the issuance of the license and no protestants appeared at the hearing of the Board on September 23, 1965, when the Board considered the application. At that hearing, the Board received evidence that the Alumni Association was a bona fide club, not founded for the sole purpose of obtaining a liquor license, and that the premises were suitable for the type of license for which the application had been made. The Board granted approval of the license on September 23, 1965, but delayed the actual issuance of the license until extensive renovations of the basement of Millbrook House, already underway, were completed so that there could be an inspection by the Bureau of Building Inspection, the Fire Department and the Health Department of Baltimore City to insure that the premises were suitable for the operation of a club liquor license. The renovations were completed in February 1966 at an approximate cost of between $20,000 and $25,000 and the license issued on February 10, 1966. It was put to immediate use although the clubroom was not then opened on any regular schedule but was used only for meetings of the Executive Committee of the Alumni Association and other prescheduled events.

The license was renewed on May 1, 1966, without protest. In January 1967 the Alumni Association decided to open the recreation room on a regular schedule of three days a week, i.e., on Friday afternoon and evening, Saturday evening and Sunday evening. The club is not open at all from the last part of May until the following early part of October of each year. The usual attendance on the scheduled days when the recreation room is open is approximately 25 to 30 people.

It was not until the renewal of the liquor license was sought for the license year beginning May 1, 1967, that a protest to the Board was filed by residents and property owners in the neighborhood of Millbrook House, including the applicants in this case. The Board conducted a hearing on this protest on April 13, 1967, at which time evidence was produced in regard to the alleged improper issuance of the license, the alleged disturbing effect of the license upon the neighborhood and the positions of the neighbors in regard to the renewal of the license. After a lengthy hearing, the Board denied the protest and renewed the license. The protestants at that hearing decided not to appeal to the Baltimore City Court from this renewal of the license.

The license has been renewed on May 1, 1968, and May 1, 1969, both without protest.

The original bill of complaint in the present case was filed in the Circuit Court of Baltimore City on March 31, 1967. The Board filed a demurrer (and answer) to the original bill of complaint on June 3, 1967, and Loyola filed a demurrer on July 21, 1967. On June 5, 1968 the demurrer of Loyola was overruled but the demurrer of the Board was sustained, except as to paragraph 27 of the original bill of complaint. On June 27, 1968, there was a substitution as parties defendant of two new members of the Board for the members of the Board displaced by the new members and on June 28, 1968, an Amended Bill of Complaint was filed by the plaintiffs below. Ultimately, answers were filed to the Amended Bill and the trial below proceeded thereafter in regular course until the final order of July 1, 1969, dismissing the Amended Bill of Complaint.

We will discuss additional evidence produced at the hearing in the lower court as we discuss the issues raised before us.

The appellants made two contentions before us which we will consider in the order set forth in the appellant's brief.

## (1)

First, the appellants contend that the lower court clearly erred in finding that the Board had complied with the requirements of Article 2B of the Maryland Code concerning zoning, posting of notice, and advertising when it approved the liquor license on September 23, 1965. We do not agree with this contention.

The thrust of the appellant's argument on this point is that the uncontroverted evidence showed that there was no certificate of occupancy issued by the Bureau of Building Inspection for the use of Millbrook House as a club as required by the Baltimore City Zoning Ordinance and hence the liquor license was issued contrary to the provisions of Article 2B, § 43, which prohibits the issuance of a liquor license in violation of any zoning rule or regulation.

Article 2B, § 43 of the Maryland Code specifically provides as follows:

> "No license or permit under the provisions of this Article shall be issued in violation of any zoning rule or regulation as the same may from time to time exist under and by virtue of any ordinance or ordinances passed pursuant to the authority contained in Article 66B of the Code of Public General Laws of Maryland, title 'Zoning', or Chapter 599 of the Acts of the General Assembly of 1933."

The relevant portions of the Baltimore City Zoning Ordinance are Sections 46 (a) and (b) of Article 40 of the Baltimore City Code (1966), providing as follows:

> "(a) It shall be unlawful to use or permit the use of any building or land or part thereof hereafter created, erected, altered, changed or converted, wholly or partly, in its use or structure until a certificate of occupancy, to the effect that the building or land or the part thereof so created, erected, altered, changed or converted and

the proposed use thereof conform to the provisions of this ordinance, shall have been issued by the Zoning Commissioner.

"(b) A certificate of occupancy shall be required for the use of every building, or part thereof where a building is used for more than one use, or the use of land in Baltimore City, *provided, however, that a permit issued by the Bureau of Building Inspection clearly stating the use and the extent of such use in a building or part thereof or the extent of the use of land, shall be sufficient as a certificate of occupancy."* (Emphasis supplied.)

At the hearing in the lower court, the plaintiffs offered the testimony of Franklin W. Ashmeyer, Jr., Zoning Enforcement Officer for Baltimore City. Mr. Ashmeyer testified that in the Zoning Department file there was no certificate of occupancy, but he pointed out that there were permits in "our file showing the property as being used for alumni purposes." He considered that the use of the basement with the proposed liquor license was a permitted use under the then existing zoning law "since it was considered the same as a club operated on a non-profit basis." As we have already indicated, when the Board submitted the application to the Zoning Division for its approval in regard to zoning, it was marked "residential—approved for private club" and returned to the Board. Further, we have already observed that various applications and permits issued by the Bureau of Building Inspection in connection with the renovations of Millbrook House indicated that it was used for alumni or college purposes and that the Bureau of Building Inspection made an annual inspection of the property as a building used for public gatherings. It is clear to us that the *purpose* of Article 40, Section 46 of the Baltimore City Code has been carried out. That purpose was to give the proper city authorities notice of any change in use of a property so that those officials could ascertain whether

or not there was any violation of the applicable laws. Subsection (b) indicates that a *formal* and *separate* "certificate of occupancy" is not necessarily required when a building is used for more than one use—as was Millbrook House during the first part of the period of renovations—and that a permit stating the use and the extent of the use "shall be sufficient as a certificate of occupancy." In our opinion, the mentioned applications and permits sufficiently indicate the alumni and college use, and there was substantial compliance with Article 40, Section 46 of the Baltimore City Code so that the Zoning Division correctly indicated compliance with the zoning law on the application for the liquor license.

Second, the appellants argue that the evidence at the hearing in the lower court established that the Board failed to comply with the provisions of Art. 2B, § 60 (b) of the Maryland Code requiring that:

> "If the application [for a license] be in Baltimore City. . .the board shall cause a suitable sign or notice to be posted and to remain posted for a period of ten days in a conspicuous place upon the premises described in the application, said posting to be done at least ten days before action upon such application, and said notice shall also specify the class of license applied for and the time and place fixed by the board for hearing upon the application." (Emphasis supplied.)

There is no question that *two* signs were posted and remained posted for the 10 day required period. The applicants contend that there was no sign posted in "a conspicuous place" on the premises because, they say, although one of the signs was nailed to a post 14 feet in front of the front door of Millbrook House, there was no walkway leading up to the entrance to the dwelling and the sign on the post was 121 feet from the nearest point on the public sidewalk. They further state that there were at the time a four foot high stone wall, some 40

trees and numerous shrubs between the building and the sidewalk. Plaintiffs' Exhibit No. 3, however, is a photograph of Millbrook House which shows the sign posted by Inspector Downey. There are some five steps up from the paved driveway to a flat area of concrete walk leading to the front door of the house and the sign—plainly visible in the photograph—is on the left of the concrete walk, 14 feet from the front door.

As we have stated, because the property itself was on a side street, Mr. Van Collom testified that he instructed the Inspectors for the Board "that in addition to posting the property. . .to post the sign near the corner of Millbrook and Cold Spring Lane." Inspector Downey testified that he posted this second sign on the "athletic field," on a stand "supplied by Dr. Fisher" from Loyola. Plaintiffs' Exhibit No. 4 was a photograph showing the location of the second sign behind an open mesh wire fence near the large permanent sign marked "Loyola College," just off the sidewalk at the intersection of Millbrook Road and Cold Spring Lane. Inspector Downey testified "you couldn't miss the sign."

The signs used by the Board are red, 18.25 inches long and 14.5 inches wide. The lettering on the sign is black, the largest letters (1.25 inches in size) being in the word "Notice." The type of license, the name of the applicant and the time and place of the hearing appear on the sign. On the second sign it was noted that the property at which the license would be used was "4603 Millbrook Road."

Inspector Downey testified on cross-examination that he had been employed by the Board since February 1950 and had used the same form of notice during the entire time, his regular duties requiring him to post signs in connection with applications every three weeks. He stated that in his opinion "these signs were posted so they could be seen."

Mr. Van Collom also testified that in the posting and advertising of the property in the present case he had not "in any way deviated from the administrative prac-

tice" which had been his "experience over the last nineteen years."

Dr. George Weinstein, as assistant professor of ophthalmology at the Wilmer Institute of the Johns Hopkins Hospital and University, testified for the plaintiffs below that "an individual with visual acuity of 20/20 could be no more than seventy feet from these characters [the letters of the word 'Notice'] and still correctly read the characters." In his opinion the highest contrast is a white sign with black letters and that a sign of black letters on a red background or black on any other color "would be correspondingly lower contrast," and only visible at a shorter distance than seventy feet. In answer to a hypothetical question, he expressed the opinion that the red sign in question "would not have been legible at a distance of 120 feet." He admitted on cross-examination, however, that a person with normal color vision could tell that there was a red sign at 120 feet, but would not "necessarily notice that this [the black letters] was lettering."

The appellants correctly stated in their brief and before us that a term in a statute, when not defined in the statute itself, should be understood to be used in its commonly accepted meaning, citing *Simpler v. State, Use of Boyd*, 223 Md. 456, 165 A. 2d 464 (1960), and pointing out to us that in Webster's New International Dictionary, the word "conspicuous" is defined as "obvious to the eye or mind, plainly visible, manifest, hence attracting or tending to attract attention, as by reason of size, brilliance, contrast or station; * * *"

In our opinion, giving the meaning urged upon us by the appellants to the word "conspicuous", there was sufficient evidence in the case supporting the Chancellor's finding that the posting complied with the provisions of Article 2B of the Maryland Code.

Even at 120 feet it was "manifest" that there was a sign of unusual color posted near the front door of the property, and any one interested in the property would reasonably go forward until he could read the contents

of the notice. In addition, there was an identical sign near the intersection of Cold Spring Lane and Millbrook Road which was clearly visible and only four feet from the sidewalk. We cannot say that the Chancellor was clearly in error in concluding that the posting in the instant case complied with the statutory requirement of "conspicuous" posting.

Third, the appellants argue that there was a failure to advertise properly as required by Art. 2B, §§ 40 (b) and 60 (a). These sections provide as follows:

> Section 40 (b). "If the application is made for a corporation, or a club, whether incorporated or unincorporated, the license shall be applied for by and be issued to three of the officers of such corporation or club, as individuals, for the use of the corporation or club. . . ."
> Section 60 (a). "Before the board of license commissioners for Baltimore City or any county shall approve any license, the said board shall cause a notice of such application to be published. . . , the said notice shall specify the name of the applicant. . . ."

We have already stated the reason why Mr. Van Collom suggested the substitution of Maurice S. Bozel, another officer of the Alumni Association, for John C. Byrnes in the original application and the long continued administrative practice of the Board in not requiring a re-advertisement of the application under these circumstances, based upon the Board's interpretation of an Opinion of the Attorney General, 32 O.A.G. 60, March 25, 1947, in regard to a renewal application. The Board has applied this ruling to an original application in which the same problem was involved. This contemporaneous and long continued administrative interpretation is entitled to substantial weight by us. *The F. & M. Schaefer Brewing Co. v. Comptroller*, 255 Md. 211, 257 A. 2d 416 (1969). We are of the opinion that this represents the correct interpretation of § 60 (a) so far as the publica-

tion of notice is concerned in the limited circumstances mentioned. The Chancellor properly found that the Board had advertised the notice of the application "as required by law."

### (2)

The Chancellor was of the opinion that in view of the provisions of Article 2B, § 175 of the Maryland Code, the equity court lacked jurisdiction to grant the relief prayed for by the plaintiffs in the Amended Bill of Complaint.

Article 2B, § 175 provides as follows:

> "(a) The decision of the board of license commissioners for Baltimore City. . .in approving . . .any license, or licensee, shall be subject to appeal in the following manner:
>
> "(b) Any licensee or applicant for a license, or any group of not less than ten persons who are residents or real estate owners in the precinct or voting district in which the licensed place of business is located or proposed to be located, may appeal therefrom. . .in the city to the Baltimore City Court. . . ."
>
> * * *
>
> "(e)—(1) (i) Upon the hearing of such appeal, the action of the local board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local board's discretion in rendering its decision was not honestly and fairly exercised, *or that such decision was arbitrary or procured by fraud, or unsupported by any substantial evidence, or was unreasonable, or that such decision was beyond the powers of the board, and was illegal. . . .*
>
> "(f) The decision of the court thus given shall be final and effective at once. *No further appeal shall lie to the Court of Appeals of the*

*State, nor shall there be any other remedy by which the local board's decision may be reviewed in court, either by way of mandamus, injunction, certiorari or otherwise. . . ."*
(Emphasis supplied.)

We construed these provisions of Art. 2B, § 175 in *Board of Liquor License Commissioners of Baltimore City v. Leone,* 249 Md. 263, 267-269, 239 A. 2d 82, 85-86 (1968) in which Judge Singley, for the Court, aptly observed:

"From a careful reading of the section, it is apparent that the legislative intent was to severely limit the right of appeal. The action of the Board restricting a license or licensee may be appealed by the licensee to the Baltimore City Court. There is a presumption that the Board's action was proper and in the public interest, and the petitioner has the burden of proving that it was otherwise. The decision of the court is final, and no further appeal lies to this Court, except under the limited conditions described in subsection (f)."

In Note 4 it was pointed out that:

"The legislature, of course, cannot deny the right of judicial review where there has been illegal or unconstitutional administrative action. Heaps v. Cobb, 185 Md. 372, 379, 45 A. 2d 73 (1945) ; Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1, 36 (1964)."

In our opinion, our decision in *Poe v. Mayor and City Council of Baltimore,* 241 Md. 303, 216 A. 2d 707 (1966) is persuasive on this aspect of the present case. In *Poe,* the plaintiffs property owners, without having first sought to obtain their administrative remedies before the Board of Municipal and Zoning Appeals, filed a bill of complaint in the Circuit Court of Baltimore City for a

declaratory judgment that the Zoning Ordinance of Baltimore City was unconstitutional and void as applied to their property. They alleged that the residential zoning classification, in view of a change in conditions, was unreasonable and arbitrary, resulting in a taking of their property without due process of law. The City demurred to the bill of complaint and the Chancellor sustained the demurrer without leave to amend. This Court affirmed and held that the failure of the plaintiffs to exhaust their administrative remedy barred them from obtaining relief in the equity court.

In a comprehensive and carefully considered opinion, Judge Oppenheimer, for the Court, reviewed the prior Maryland cases on this question and pointed out the distinction which existed between the prior cases in which relief in equity had been granted and prior cases in which such relief had been denied because of a failure to seek or pursue the available administrative remedy.

After observing that the Baltimore City Zoning Ordinance provides for judicial review from the decisions of the Board of Municipal and Zoning Appeals and that the administrative remedy provided by the ordinance was full and adequate, Judge Oppenheimer stated in the *Poe* opinion:

> "The appellants contend that, even though there be an administrative remedy, a court of equity may intervene and act when a constitutional question is involved. They recognize the relevance of *Seabolt* to the situation here presented, but seek to restrict the authority of that case to the precise facts there presented.

> "In support of their argument, the appellants cite general statements from some of this Court's prior opinions which, taken apart from the actual decisions involved, tend to support their contention. For example, in *Schneider v. Pullen*, 198 Md. 64, 68, 81 A. 2d 226 (1951), Chief Judge Marbury, for the Court, said: 'We have, however, been careful to point out that

where constitutional questions are involved, the litigant has the right to raise them in a court of equity, and such court has the right to consider them,' and in *Kracke v. Weinberg*, 197 Md. 339, 343, 79 A. 2d 387 (1951), Chief Judge Marbury said, for the Court: 'It has been, of course, well settled that where a constitutional question is involved, equity may intervene and enjoin action by an administrative body, although this is not favored where there are statutory remedies which permit the raising of such a question.'

"There are few absolutes in the law, and the rule that an administrative remedy must be exhausted before recourse is had to the courts is not one of them. However, an analysis of our decisions shows that, while the principle may not bar court action under certain circumstances, the rule generally applies where the constitutional issue raised goes, not to the validity of the zoning ordinance as a whole, but to its application in a particular case, and where the administrative remedy is adequate.

"Where there is no adequate administrative remedy, or where that remedy does not provide for judicial review of the agency's action, we have made it clear that recourse may be had to the courts. *Heaps v. Cobb*, 185 Md. 372, 45 A. 2d 73 (1945) ; *Hecht v. Crook*, 184 Md. 271, 40 A. 2d 673 (1945). See Cohen, *Some Aspects of Maryland Administrative Law*, 24 Md. L. Rev. 1, 35-38 (1964). In zoning matters, when the property owner contends the action of the administrative body was an invalid taking and the zoning ordinance does not provide any remedy by way of appeal, we have held that the constitutional issue is properly presented by a bill in equity. *England v. Mayor and City Council of Rockville*, 230 Md. 43, 45, 185 A. 2d 378

(1962). See also *Congressional School v. State Roads Comm'n*, 218 Md. 236, 243, 146 A. 2d 558 (1958) and cases therein cited.

"One category in which the principle that an equity court may take jurisdiction over a dispute as to constitutionality may come into play comprises the cases involving constitutional attack upon the validity of a general statutory enactment as a whole (as contrasted with its application to particular facts). Such cases are *Schneider v. Pullen, supra,* in which the statute attacked provided that private trade schools and certain other educational institutions must secure certificates of approval from the State Superintendent of Schools, and *Oursler v. Tawes,* 178 Md. 471, 13 A. 2d 763 (1940), which involved the constitutionality of comprehensive amendments to the state income tax law.

"Another category of decisions in which that principle may be applied is where there is an attack upon the validity of a statute or ordinance not general in nature but enacted with particular reference to the property of the complainant. Here again, the attack is not upon the applicability of a general legislative enactment to the particular circumstances, but upon the validity of the legislation itself. *Commissioners of Cambridge v. Eastern Shore Public Service Co.,* 192 Md. 333, 337, 64 A. 2d 151 (1949), involved not zoning but the validity of charter powers of franchises under a statute granting the appellant authority to construct or acquire an electric power distribution system. Judge Henderson, for the Court, said that the rule that where an appeal from the action of an administrative body is provided by statute such remedy is exclusive, is 'predicated upon the undesirability of by-passing administrative action, particularly where such action is within the expert

knowledge of the administrative tribunal.' He found, however, that the Public Service Commission is essentially a regulatory body, and has no power to grant a franchise which is essentially a legislative function. *Richmark Realty Co. v. Whittlif*, 226 Md. 273, 173 A. 2d 196 (1961); *Kracke, supra;* and *Northwest Merchants Terminal, Inc. v. O'Rourke*, 191 Md. 171, 60 A. 2d 743 (1948), all involved the constitutionality of amendments to the zoning law which, by legislative action, particularly affected the classifications of the properties involved. In *Richmark,* the opinion pointed out that the primary attack was on the validity of the challenged ordinance which waived the prohibition of the zoning law against establishment of a filling station within 300 feet of a public park. In *Kracke* and *O'Rourke* the Court found that property was being taken without compensation by legislative action under a rezoning ordinance.

"Even in cases within the above categories, none of which involves the constitutionality of the application of general statutory regulations by an administrative agency to a particular property, the right of the property owner to resort to an equity court is not unqualified. See *Kracke, supra.* In *Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U. S. 752, 773-74 (1947), which involved the constitutionality of the First and Second Renegotiation Acts, Mr. Justice Rutledge, in delivering the Court's opinion, said:

" 'It is true that the presence of constitutional questions, coupled with a sufficient showing of inadequacy of prescribed administrative relief and of threatened or impending irreparable injury flowing from delay incident to following the prescribed procedure, has been held sufficient to dispense with exhausting the administrative process before instituting judicial in-

tervention. But, without going into a detailed analysis of the decisions, this rule is not one of mere convenience or ready application. Where the intent of Congress is clear to require administrative determination, either to the exclusion of judicial action or in advance of it, a strong showing is required, both of inadequacy of the prescribed procedure and of impending harm, to permit short-circuiting the administrative process. Congress' commands for judicial restraint in this respect are not lightly to be disregarded.'" (241 Md. at 308-311, 216 A. 2d at 709-711).

As we have already observed, the constitutional attack in the instant case *is not upon the general validity of the applicable statute* but in its *application to the particular situation* of the appellants. In short, the contention is that the Board failed to comply with the statutory requirements in regard to zoning, posting and advertising, not that the provisions of the statute in those regards are not, if properly carried out, reasonably calculated to afford notice and due process of law. The proper performance of the statutory requirements is quite within the expertise of the Board and inasmuch as there is a provision for judicial review to the Baltimore City Court, there is every reason that the requirement for exhaustion of administrative remedies should apply.

As Judge Oppenheimer further stated:

"If the courts took jurisdiction in the first instance, they would be transferring to themselves the responsibility which the legislative body placed upon the administrative agency. The courts would decide issues which, might never arise if exhaustion of the administrative remedy were required." (241 Md. at 311, 216 A. 2d at 711).

The present case is a striking illustration of the sound-

ness of this observation. The appellants, with others, had submitted the identical issues of fact passed upon by the Chancellor in the instant case, to the Board for its determination on their protest against the renewal of the liquor license. The Board took testimony and found against them on April 23, 1967. The appellants *then declined to appeal* that determination to the Baltimore City Court. Instead, they filed an Amended Bill of Complaint in the equity suit and, in effect, relitigated the same issues already determined by the Board. It is apparent that the legislative policy that these matters be considered by the administrative agency with a limited right of appeal would be frustrated if recourse to the equity court could be had in these circumstances.

The appellants do not challenge the administrative remedy, itself, as not being full and complete and it would be difficult indeed for them to do this in view of the fact that they sought relief under it in the present case and were afforded a full and complete hearing before the Board.

Art. 2B, § 28 (a) in regard to protests and hearings upon applications for renewal of licenses specifically provides that if "such protest has been filed it shall be heard and determined as in the case of original applications." In construing an identical provision in predecessor legislation (Art. 2B, Section 27 of the 1939 Maryland Code), Chief Judge Dennis in the case of *Cargill vs. Board of Liquor License Commissioners of Baltimore City*, filed May 25, 1944, and published in *The Daily Record* of May 27, 1944, stated:

> "Per Section 27 of the Act, upon the filing of a protest, such as was filed in this case, the Board must hold a hearing precisely as in the case of original applications. In acting upon an original application the Board shall determine the facts. If granting the license is (1) not necessary for the accommodation of the public, or (2) the operation of the business will unduly

disturb the peace of the residents of the neighborhood, or (3) there are other reasons (in the discretion of the Board) the license shall be refused in the public interests. Such are the rules controlling the Board and this Court."

After the protest filed by the appellants and others before the Board on March 31, 1967 (the same day as the filing of the original bill of complaint in the present case), the Board did properly hold a hearing to receive and consider testimony in regard to the alleged lack of "conspicuous" posting and improper advertising in connection with the original licensing. It made a determination upon these issues. The protestants were then bound by that determination unless they successfully challenged it on appeal to the Baltimore City Court, which they declined to do. See *Woodlawn Area Cit. Assn. v. Board of County Commissioners,* 241 Md. 187, 216 A. 2d 149 (1966).

There was no unreasonable delay involved in the instant case in the presentation of the protest to the Board by the appellants and other protestants. The administrative remedy, as we have indicated, was full and complete. As the Chancellor stated during the course of the hearing, the plaintiffs below *could* have perfected an appeal to the Baltimore City Court from the adverse decision of the Board, where a judge of the Supreme Bench of Baltimore City would have heard the appeal in regular course.

In our opinion, the Chancellor properly dismissed the Bill of Complaint for lack of jurisdiction in equity because of the failure of the plaintiffs to exhaust their administrative remedy by appeal to the Baltimore City Court, as well as because of the conclusive determination by the Board itself on the renewal hearing.

*Order affirmed, the appellants to pay the costs.*