729 A.2d 407

**BOARD OF LICENSE COMMISSIONERS
FOR CHARLES COUNTY, Maryland**

v.

**Eva TOYE t/a Toye's Inn.**

**No. 140, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 14, 1999.

Roger Lee Fink, County Atty. for Charles County, LaPlata, for petitioner.

Patricia N. Drummond, Upper Marlboro, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

### I.

Respondent Eva Toye owns and operates a restaurant and tavern in Charles County, Maryland, trading as "Toye's Inn." For twenty-seven years, Ms. Toye held an "on and off sale" alcoholic beverage license for Toye's Inn. Petitioner, the Board of License Commissioners for Charles County (Board), filed a show cause order and a formal protest against the renewal of respondent's license on March 6, 1997. Due to typographical errors in those documents, petitioner filed an amended protest and amended show cause order on March 13, 1997. Copies of all four documents were served upon respondent, which notified respondent of a scheduled hearing. Petitioner, however, did not publish a general public notice of the renewal hearing.

The amended show cause order alleged that "numerous fights, stabbings, and shootings" and "numerous sales of controlled dangerous substances" had occurred at Toye's Inn during the preceding ten months, threatening the "peace and safety of the community." At a hearing on April 10, 1997, an assistant county attorney presented to petitioner the testimony of four peace officers with the Charles County Sheriff's Office who described incidents of illegal drug activity on the Toye's Inn property. Respondent called no witnesses on her behalf. After a unanimous vote of the Board during a April 24, 1997, hearing, petitioner denied renewal of respondent's license in a written opinion filed May 8, 1997.

Respondent sought judicial review in the Circuit Court for Charles County, which affirmed petitioner's findings of fact and conclusions. An appeal to the Court of Special Appeals followed. That court reversed the circuit court in an unreported opinion, holding that petitioner was required to provide public notification of the renewal hearing. Petitioner sought a writ of certiorari, which we granted, presenting the following issue:

When a protest to the annual renewal of an alcoholic beverage license is initiated by a County Board of License Commissioners and served on the Licensee pursuant to Md.Code Ann., Article 2B, § 10–301(a), whether the Board is also required to publish a general public notice of the hearing in strict compliance with the provisions of Md.Code Ann., Article 2B, §§ 10–202(a)(1)(i–iv) and 10–202(a–1).[1]

Under the circumstances of this case, we hold that, pursuant to the statute applicable here, publication of a general public notice is required prior to a hearing on a protest to the renewal of an alcoholic beverage license. Accordingly, we affirm the judgment of the Court of Special Appeals.

## II.

As relevant to the case *sub judice*, Maryland Code (1957, 1996 Repl.Vol.), Article 2B, section 10–301(a)(1),[2] described the renewal process in effect at the time of petitioner's protest:

[T]he holder of any expiring license ... shall, not less than 30 nor more than 60 days before the first day of May of each and every year, file a written application ... for the renewal of the license.... *A license by way of renewal may not be approved without a hearing ... if a protest has been filed against the granting of the new license* at least 30 days before the expiration of the license for which renewal is sought. This protest shall be (i) signed by not less than ten residents or real estate owners in the immediate vicinity in which the licensed place of business is located; or (ii) instituted by the board of licensing commissioners on its own initiative. *If the protest has been filed it shall be heard*

---

**1.** As we shall discuss, *infra*, Article 2B, which contains the laws pertaining to alcoholic beverages, contemplates opportunities for broad public participation in the process of the issuance and, if protested, renewals of liquor licenses.

**2.** All statutory references are to Article 2B as codified in the 1996 Replacement Volume unless otherwise indicated. Recent legislative changes to Article 2B since the issuance of the 1996 Replacement Volume have not altered substantively any provisions relevant to this appeal.

*and determined as in the case of original applications....*[Emphasis added.]

The procedure for original applications for alcoholic beverage licenses was described, as pertinent to the case before us, in section 10–202:

(a) *General procedure.*—(1)(i) Before the Board of License Commissioners for Baltimore City or any county approves any application for a license, the Board shall cause a notice of the application to be published two times in two successive weeks:

. . . .

2. For county licensee applicants—in two newspapers of general circulation in the county where two newspapers are published, and if not, then in one newspaper having a general circulation in the county.

. . . .

(iv) At the time fixed by the notice for a hearing on the application ... *any person shall be heard* on either side of the question.

(2)(i) The application shall be disapproved and the license for which application is made shall be refused if the Board of License Commissioners for the ... county determines that:

1. The granting of the license is not necessary for the accommodation of the public;

2. The applicant is not a fit person to receive the license for which application is made;

3. The applicant has made a material false statement in his application;

4. The applicant has practiced fraud in connection with the application;

5. The operation of the business, if the license is granted, will unduly disturb the peace of the residents of the neighborhood in which the place of business is to be located; or

6. There are other reasons, in the discretion of the Board, why the license should not be issued.

. . . .

(a–1) *Publication in Charles County.*—Notwithstanding the provisions of subsection (a) of this section, in Charles County, *before the Board of License Commissioners approves any license, the Board shall cause notice of the application to be published* 2 times in 2 successive weeks, in 1 newspaper of general circulation in Charles County. [Emphasis added.]

### III.

■ In appeals from the decisions of alcoholic beverage licensing boards, our scope of review is determined by section 16–101(e)(1)(i):

> Upon the hearing of such appeal, the action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the [licensee] to show that the decision complained of was against the public interest ... or that such decision was beyond the powers of the local licensing board, and was illegal.

This Court and the Court of Special Appeals have noted that quasi-judicial decisions of administrative agencies, including local alcoholic beverage licensing boards, are typically subject to reversal if reached in an illegal manner. *See Maryland Aggregates Ass'n v. State,* 337 Md. 658, 678, 655 A.2d 886, 896 ("Maryland's courts have inherent power to correct agency adjudicatory determinations that are ... illegal."), *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514, 523 (1975) ("[W]hen an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal ... manner."); *Board of Liquor License Comm'rs v. J.R. Bros.,* 119 Md.App. 308, 312, 705 A.2d 16, 18 (1998) ("If the Board[ ]

... committed no error of law, we must ... affirm the Board's decision. If the Board[ ] ... did commit an error of law, we must [reverse its decision]."). In this case, if section 10–301(a)(1) required petitioner to give public notice as described in section 10–202(a–1), then petitioner's findings of fact and conclusions, though prima facie correct, were reached through an illegal procedure and the case should be remanded for a new hearing. *See* Art. 2B, § 16–101(e)(4)(ii) (authorizing remand of the proceedings in Charles County). We turn first to the meaning of the relevant portion of section 10–301(a)(1).

■■■ "The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent first must be sought in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks*, 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck*, 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss*, 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute itself to determine legislative intent. *Marriott Employees*, 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

■■■ We begin the interpretation of a statute by ascertaining the plain ordinary meaning of the relevant language. This Court explained in *Romm*, 340 Md. at 693, 668 A.2d at 2, however, that statutory language cannot be defined by dictionary definitions alone:

"In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention." *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986). We start by examining the language of the statute. *Id.* We are not constrained, however, by ... "the literal or usual meaning" of the terms at issue. *Id.* at 75, 517 A.2d 730. "A dictionary is a starting point in the work of statutory construction, but not necessarily the end." *Morris v. Prince George's County,* 319 Md. 597, 606, 573 A.2d 1346 (1990).

We noted in *Tucker,* 308 Md. at 73, 75, 517 A.2d at 731, 732, that

[t]he primary source of legislative intent is, of course, the language of the statute itself.... Of course, where statutory provisions are clear and unambiguous, no construction or clarification is needed or permitted, it being the rule that a plainly worded statute must be construed without forced or subtle interpretations designed to extend or limit the scope of its operation.

. . . .

... We ... recognize the rule that where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense. [Citations omitted.]

*See also Farris v. State,* 351 Md. 24, 28–29, 716 A.2d 237, 240 (1998) ("If the language of a statute is ambiguous, we consider the usual meaning of the words in the context of the setting and the objectives and purposes expressed by the Legislature."). In *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992), it was argued that we should strictly interpret the

language of an alimony statute according to its literal meaning. We disagreed, noting that:

> While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears.

*Id.* at 387, 614 A.2d at 594 (citations omitted).

██ We have also noted that when "there is a lack of relevant legislative history,[3] we must rely substantially on the language of the statutes in the context of the goals and objectives they seek to achieve." *Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632, 566 A.2d 94, 97 (1989) (citing *Kaczorowski,* 309 Md. at 513–16, 525 A.2d at 632–33). Finally, this Court, with regard to construing various provisions of Article 2B, has said that "[t]he proper rule of construction is that all parts of . . . an article of the Code . . . must be read together as they form part of a general system. And Article 2B itself has been so read by this Court. *Baltimore Liquor Stores Assn. v. Comm'rs,* 171 Md. 426, at page 431, 189 A. 209." *State v. Petrushansky,* 183 Md. 67, 71, 36 A.2d 533, 535 (1944) (citations omitted).

██ The circuit court found that the words "heard and determined" in section 10–301(a)(1) referred only to the procedures governing the original application hearing itself, namely, the procedures that addressed the criteria listed in section 10–202(a)(2) that an alcoholic beverage licensing board must find do not exist prior to approving an original license application. The circuit court stated:

---

3. The requirement in section 10–301(a)(1) that renewal protests "shall be heard and determined as in the case of original applications" existed in the original language of Article 2B as passed in 1933 when Prohibition ended. *See* 1933 Md. Laws, Chap. 2, § 18. No other specific legislative history appears to be available.

[Section 10–301(a)(1)] says heard and determined. Heard to me contemplates the procedure associated with the presentation of evidence as such before the board.

Determined to me means that the board is to act as it would in considering that evidence and making its determinations as contemplated by paragraph [(a)(2)(i)] and following of section 10–202.

As relevant to this appeal, "hear," the present tense of "heard," means "5. to give a formal, official, or judicial hearing to (something); consider officially, as a judge, sovereign, teacher, assembly, etc.: *to hear a case.* 6. to take or listen to the evidence or testimony of (someone): *to hear the defendant.*" THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 654 (unabr. ed.1983). "Hearing" is defined as "3. opportunity to be heard: *to grant a hearing.* 4. an instance or a session in which testimony and arguments are presented, esp. before an official, as a judge in a lawsuit." *Id.* "Determine" means "7. *Chiefly Law.* to put an end to; terminate. 8. to lead or bring (a person) to a decision. 9. to decide upon." *Id.* at 393. These definitions provide no real guidance in interpreting what the legislature meant in section 10–301(a)(1) by the phrase "heard and determined"; the words are open to various legitimate but differing interpretations. Accordingly, we turn to the general policy considerations behind the licensing provisions and the meaning of the phrase within the context of the entire licensing and renewal provisions.

Maryland Code (1957, 1998 Repl.Vol. ), Article 2B, section 1–101 states, in general terms, the policy behind Article 2B and the powers granted to local licensing boards:

(a) *Regulation necessary.*—(1) It is the policy of the State of Maryland that it is necessary to regulate and control the ... sale ... of alcoholic beverages within this State ... to obtain respect and obedience to law and to foster and promote temperance.

(2) It is the legislative intent that *that policy will be carried out in the best public interest* by empowering ... the various local boards of license commissioners and liquor

control boards ... with sufficient authority to administer and enforce the provisions of this article.

(3) *The restrictions, regulations, provisions and penalties contained in this article are for the protection, health, welfare and safety of the people of this State.*

. . . .

(b) *Powers authorized.*—(1) It continues to be the policy of this State to authorize the exercise of the powers and authority provided by this article ... *to promote the general welfare of its citizens* by controlling the sale and distribution of alcoholic beverages. [Emphasis added.]

We have noted that the power of the Legislature to regulate alcoholic beverages through Article 2B derives from the State's police powers to protect the public welfare. *Erwin & Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 309 n. 8, 498 A.2d 1188, 1191 n. 8 (1985) ("It is uncontroverted that a state's right to control and regulate liquor is founded in its police power, granted to it under the twenty first amendment to the U.S. Constitution." (citing *Dundalk Liquor Co. v. Tawes,* 201 Md. 58, 66, 92 A.2d 560, 563 (1952))); *Payson St. Neighborhood Club v. Board of Liquor License Comm'rs,* 204 Md. 278, 284–85, 103 A.2d 847, 850 (1954) ("The foundation of the power of the Legislature to regulate the sale of alcoholic beverages and the grant of licenses ... is, of course, the police power.").

This Court, in dicta, also has explained the general policy within Article 2B to closely regulate the activities of local alcoholic beverage licensing boards:

Rather than providing broad general guidelines, the General Assembly has chosen to closely control by statute even the more detailed aspects of the alcoholic beverages industry. This close regulation is perhaps partly due to the fact that, unlike other regulated areas, there is not a single agency that administers the alcoholic beverages law, but rather numerous local boards that are charged with its enforcement. Regardless of the reason for its enactment, *the result of such a comprehensive statutory scheme is that the authority of the administering agencies necessarily is more*

*circumscribed than the typical administrative body.* The Liquor Board thus differs fundamentally from those agencies to which the legislature more generously delegates the particulars of a regulatory scheme.

*Board of Liquor License Comm'rs v. Hollywood Prods.,* 344 Md. 2, 13, 684 A.2d 837, 842–43 (1996) (emphasis added); *see also Baines v. Board of Liquor License Comm'rs,* 100 Md. App. 136, 141, 640 A.2d 232, 235 (1994) (noting that alcoholic beverage licensing boards must "scrupulously" follow the statutory scheme that empowers them).

The language of section 10–301 clearly works in conjunction with section 10–202. Section 10–301(a)(1) provides that if a protest to a license renewal has been filed, the protest "shall be heard and determined as in the case of original applications," original applications being governed by section 10–202. Section 10–202(a–1) indicates that hearings in Charles County on protested license renewals must be preceded by public notice. Section 10–202(a)(1)(iv) requires that "any person shall be heard on either side of the question" of renewal. Two criteria that an alcoholic beverage licensing board must examine at a protested license renewal hearing include whether the facility covered by the license being considered for renewal is "not necessary for the accommodation of the public" or would "unduly disturb the peace of the residents of the neighborhood in which the place of business is ... located." § 10–202(a)(2)(i). In Charles County, section 10–202(g) also allows petitioner to consider "the general reputation of the ... licensee and of the place of business and of the people who congregate therein." Section 10–202, therefore, contemplates that when protests are filed, a hearing will be held in which citizens from the neighboring areas may testify either for or against a license renewal, not a proceeding in which only the protestant, in this case the Board, and the licensee may call witnesses on their own behalf. The intent of section 10–301 to incorporate by reference the original application process described in section 10–202 into a renewal protest proceeding reflects that both procedures address the relationship between

the local community and the facility operating with an alcoholic beverage license.

Petitioner, and other alcoholic beverage licensing boards, generally must provide the opportunity for public testimony in order to fully address these issues. Petitioner apparently recognized this need for public testimony at protested renewal hearings when it adopted its own Rule 2.106 (1992), which states: "[t]he general public and representatives of the news media are encouraged and invited to attend *all hearings* . . . ." (Emphasis added.) When notice of a hearing is published properly, petitioner will be able to hear the comments and testimony of interested persons from the general public and incorporate them into its decision-making process. If notice is published, but no members of the general public appear and present evidence, petitioner at least can infer that there are no supporters or opponents of the renewal. In other words, the public is unconcerned. If there is no public notice, licensing boards likely will have no evidence generated by the general public and would not be able to imply any interest, or lack of interest, by the public.

Alcoholic beverage licensing boards are charged with considering public accommodation and public disturbance issues. We believe, therefore, that the requirement that renewal applications, when protests exist, "be heard and determined as in the case of original applications," requires publication of notice. Publication is the method devised by the Legislature to ensure consideration of the public's interest.

This Court noted, in dicta, the necessity of examining the public interest during hearings on protests to alcoholic beverage licenses in *Williams v. Associated Professors of Loyola College,* 257 Md. 316, 337–38, 263 A.2d 5, 15–16 (1970). In construing the "heard and determined as in the case of original applications" language in the renewal statute, we quoted a *nisi prius* opinion from the Circuit Court for Baltimore City, *Cargill v. Board of Liquor License Commissioners,* (May 25, 1944) (Dennis, C.J.):

"Per Section 27 of the Act[, now Article 2B, section 10–301], upon the filing of a protest . . . the Board must hold a hearing *precisely* as in the case of original applications. In acting upon an original application the Board shall determine the facts. If granting the license is (1) not necessary for the accommodation of the public, or (2) the operation of the business will unduly disturb the peace of the residents of the neighborhood, or (3) there are other reasons (in the discretion of the Board) the license shall be refused *in the public interests.*[4] Such are the rules controlling the Board and this Court."

*Id.* (emphasis added). Although *Williams* and *Cargill* discussed issues unrelated to the case *sub judice*, the quotation from *Cargill* indicates the importance of public input when licensing boards decide whether to renew a protested license. Public input is desirable to address, with some precision, the statutory factors protecting "the public interests."

The public, however, cannot testify regarding the public interest during protested renewal hearings without knowledge that renewal proceedings are to be conducted before the licensing board. Presumably, the only way a citizen would be aware of a renewal hearing without public notice would be by "word of mouth," typically through the protestant or the licensee. Such a method of "notice" not only would reduce the number of citizens attending the hearing to testify, but allow the parties to the proceeding to advertise the hearing only to witnesses biased toward their cause. Thus, as it must in original applications hearings, petitioner must publish general public notice of the pending protested renewal proceedings.

Finally, we address petitioner's argument that protests to renewals are more in the nature of license revocation or suspension hearings, which require only actual notice to the licensee. *See* Md.Code (1957, 1998 Repl.Vol., 1998 Cum. Supp.), Art. 2B, §§ 10–401, 10–403. Licensing boards may revoke or suspend licenses if "necessary to promote the peace

---

**4.** These factors are from the original language of Article 2B, section 6, the predecessor to section 10–202. *See* 1933 Md. Laws, Chap. 2, § 6.

or safety of the community," and apparently may do so without any official notice to the public. § 10–401(a)(2). Section 10–401(a), however, *requires* revocation or suspension for certain actions by the licensee or his or her employees:

(3) The license or permit must be revoked or suspended . . . for the following causes:

(i) Conviction of the licensee or permittee for violation of any of the provisions of the Tax–General Article that relate to the alcoholic beverage tax or the provisions of this article;

(ii) Willful failure or refusal of any licensee or permittee to comply with the provisions of the Tax–General Article that relate to the alcoholic beverage tax or any provisions of this article, or any rule or regulation that may be adopted in pursuance [thereof];

(iii) Making of any material false statement in any application for a license or permit;

(iv) Two or more convictions of one or more of the . . . servants of a licensee or permittee under the provisions of this article or . . . the Tax–General Article that relate to the alcoholic beverage tax . . . ;

(v) Possession upon the premises of any retail dealer . . . of any alcoholic beverage upon which the tax imposed by § 5–102 of the Tax–General Article has not been paid;

(vi) Violation of the provisions of § 12–104 of this article [which prohibits alcoholic beverage manufacturers and wholesalers from having any business interest in an establishment that sells alcohol retail];

(vii) Willful failure of any licensee or permittee to keep the records required by this article or . . . the Tax–General Article . . . or to allow any inspections of such records by a duly authorized person;

(viii) Possession of any alcoholic beverage which any licensee . . . is not licensed to sell;

(ix) Suspension or revocation of a permit issued to any licensee or permittee by the Federal Bureau of Alcohol, Tobacco and Firearms or for conviction of violating any federal laws relating to alcoholic beverages;  and

(x) Failure to furnish bond as required by this article. . . .

(4) Revocation and suspension of licenses is also authorized for such other offenses as specified in other parts of this article.

Thus, section 10–401 requires an alcoholic beverage licensing board to suspend or revoke a license for any of a number of specified reasons. Section 10–202(a)(2), however, requires that licensing boards reviewing protests to license renewals determine all of the listed criteria, including the criteria involving the public interest *and* those focusing on the licensee's behavior, before they may renew a protested license. Testimonial evidence by neighboring citizens, therefore, might be necessary to ascertain whether the section 10–202(a)(2) criteria that protect the community interests in renewing or denying the license exist. Notice by publication, in turn, is necessary to make the public aware of its right to be heard on those criteria at the renewal hearing.

We therefore hold that alcoholic beverage licensing boards, hearing a protest to a license renewal under section 10–301(a)(1), must provide general notice by publication as described in section 10–202 prior to holding a protested renewal hearing.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**