684 A.2d 837

BOARD OF LIQUOR LICENSE COMMISSIONERS
FOR BALTIMORE CITY

v.

HOLLYWOOD PRODUCTIONS, INC.

No. 127, Sept. Term, 1995.

Court of Appeals of Maryland.

Nov. 13, 1996.

Gerald Langbaum, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; John K. Barry, Assistant Attorney General, on brief), Annapolis, for appellant.

George L. Russell, Jr. (Donald A. Rea, Piper & Marbury, L.L.P., on brief), Baltimore, for appellee.

Before MURPHY,[*] C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

The question presented in this case is whether the Board of Liquor License Commissioners for Baltimore City exceeded its authority in restricting the hours of lawful operation of a licensee's establishment. For the reasons set forth below, we hold that this restriction was beyond the scope of its statutory authority. We also hold, as a preliminary matter, that the Board of Liquor License Commissioners has standing to appeal an adverse decision by the circuit court.

## I.

The appellee, Hollywood Productions, Inc. ("licensee") operates a Class B–D–7 licensed nightclub[1] on 32nd Street in Baltimore. In the Fall of 1994, the Board of Liquor License Commissioners ("Liquor Board") received several written complaints from area residents concerning the patrons of this establishment. The focus of the complaints was the disorderly behavior of customers exiting the club in the early Monday morning hours when the club closed. The residents reported that club patrons were disturbing the peace of the neighborhood by yelling and screaming, pounding on vehicles, honking horns, playing loud music, breaking bottles, urinating in public, parking illegally, and engaging in altercations. On more than one occasion, it appears that police intervention was

---

[*] Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. This nightclub has been known by a variety of names. Throughout the course of these proceedings, it has been referred to alternatively as the 32nd Street Nightclub, the New 32nd Street Nightclub, the 32nd Street Plaza, the 32nd Street Phase III Lounge, and the Phase III Inn.

needed to control the crowd. The parties agree, however, that none of the objectionable conduct occurred on the premises of the nightclub itself and that these disturbances were restricted to Monday mornings at approximately 2:00 a.m.

In response to the initial community complaints, the Liquor Board charged the licensee with violating Rule 3.12 of the Liquor Board Rules and Regulations and held a hearing to address the matter on November 3, 1994. Rule 3.12 of the Rules and Regulations of the Board of Liquor License Commissioners for Baltimore City provides: "Licensees shall operate their establishments in such a manner as to avoid disturbing the peace, safety, health, quiet, and general welfare of the community." Upon the conclusion of that hearing, at which representatives from the community testified, the Liquor Board directed the licensee to meet with local police and residents to ascertain measures that might alleviate the problem and to report the outcome of these meetings to the Board. Club management complied with this directive and, subsequently, notified the Board that it had: (1) raised the minimum age for admission to 25; (2) upgraded the dress code; (3) discontinued live exotic dance performances; (4) adopted a 1:30 a.m. closing time; and (5) begun announcements encouraging peaceful and quiet egress from the club.

On December 29, 1994, the Liquor Board held a "compliance conference" with club management and representatives from the community to assess the progress made toward addressing the residents' concerns. It was generally agreed that there had been some improvement. On January 16, 1995, however, the Board received word from a community association that conditions had again worsened and that, on the preceding night, there had been twelve police squad cars and two police wagons in the area, several hundred individuals milling about and disturbing the peace, and at least two arrests. The association sent further reports of disruptive conduct to the Board on January 23, 1995, and January 30, 1995, as well as a formal request that the Board prohibit the nightclub from operating on Sunday evenings.

As a result of these communications, the Liquor Board again charged the licensee with violating Rule 3.12 and scheduled a hearing for March 9, 1995. At the conclusion of this hearing, the Board directed the licensee to close the nightclub at 11:00 p.m. on March 19 and March 26, 1995. In its subsequent written decision dated April 10, 1995, the Board stated:

"The Board strongly feels that it is not in the best interest of the community to continue to permit the Sunday evening to early morning operation [of the nightclub] to remain. Ample opportunity was provided the licensee to correct the complaints to the degree that all parties could live in peace and harmony. It is the consensus Opinion of the Board that this has not occurred and will not occur without specific guidance and direction from this Board.

**Therefore, effective immediately, the Board orders the licensee to close this premise on Sunday evening at 7:00 p.m. The premise may operate from 12 noon on Sundays to 7:00 p.m. Sunday evening. At that time the premise must close and cannot re-open until Monday morning at 6:00 a.m."** (Emphasis in original).

Opinion of the Board of Liquor License Commissioners for Baltimore City (April 10, 1995).

The licensee sought judicial review of the Board's decision in the Circuit Court for Baltimore City. The circuit court reversed on the ground that the restriction of the nightclub's hours of operation exceeded the scope of the Board's statutory authority, and the Liquor Board noted an appeal of this adverse ruling to the Court of Special Appeals. Prior to consideration by the intermediate appellate court, however, this Court issued a writ of certiorari on its own motion and ordered that the case be docketed for its consideration.

## II.

As a preliminary matter, we must address whether the Liquor Board has standing to appeal the adverse ruling of the circuit court. The licensee asserts that, pursuant to the

decision of this Court in *Liquor License Board v. Leone,* 249 Md. 263, 239 A.2d 82 (1968), the Board has no right to appeal the reversal of its decision by the circuit court. In *Leone,* we did in fact hold that appeals by a liquor board were not permitted by law. *Leone,* 249 Md. at 267–69, 271, 239 A.2d at 85–86, 87. Subsequent developments in both statutory and case law, however, undermine *Leone*'s present applicability.

At the time that *Leone* was decided, § 175(f) of the Alcoholic Beverages Act severely limited the opportunity for appeal of circuit court rulings. The decision of a court reviewing a liquor board action was final under that provision; further appeal was permitted only to resolve inconsistencies among the circuits. *See* Maryland Code (1957, 1968 Repl.Vol.), Article 2B § 175(f). In the *Leone* court's view, this manifest legislative intent to limit appellate review supported a narrow interpretation of the liquor board's particular right to appeal. *See Leone,* 249 Md. at 267–69, 239 A.2d at 85–86. The Court reasoned that if the General Assembly had envisioned appeals by the liquor board, it would have expressly conferred this right by statute. *Leone,* 249 Md. at 269, 239 A.2d at 86. It is significant, therefore, that in 1992 the legislature amended § 175 to provide that "any party of record to an appeal of a decision of a local licensing board to the circuit court may appeal the decision of the circuit court: (i) To the Court of Special Appeals; or (ii) By certiorari, to the Court of Appeals." Chapter 510 of the Acts of 1992 (codified as Md.Code (1957, 1996 Repl.Vol.), Art. 2B, § 16–101(f)).[2] Therefore, the current version of the statute broadly confers the right of appeal to any "party of record." The reasoning upon which this Court partly based its decision in *Leone* is thus no longer viable.

---

**2.** Since the time that the Liquor Board imposed the sanction at issue in the instant case, the General Assembly has amended certain provisions of Article 2B. Because the relevant portions of those provisions remain substantively unchanged, we will cite Article 2B as it is now codified. Hence, unless otherwise indicated, all subsequent statutory references are to Maryland Code (1957, 1996 Repl.Vol.), Article 2B.

Perhaps even more importantly, the common law underpinnings of *Leone* have evolved and are now of more limited application. In reaching its decision, the *Leone* court referenced the principle set forth in *Board of Zoning Appeals v. McKinney*, 174 Md. 551, 564, 199 A. 540, 546 (1938), that administrative agencies exercising a quasi-judicial function may not appeal circuit court reversals of their decisions, absent specific statutory authority. It is significant that the role of the agency at issue in *McKinney*, the Board of Zoning Appeals, was "merely to find facts, to apply to those facts rules of law prescribed by the Legislature, and to announce the result." *McKinney*, 174 Md. at 560–61, 199 A. at 544. The agency was not engaged in policy making or other executive functions and served only a non-adversarial, judicial role. *Id.* Judge Offut, on behalf of the Court, thus likened the agency to a justice of the peace and held that it had no right to appeal circuit court judgments. *McKinney*, 174 Md. at 562, 199 A. at 545. Although *McKinney* was a significant factor in *Leone*, we have since limited the *McKinney* doctrine.[3]

In *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 746, 501 A.2d 48, 56 (1985), we recognized that the functions of certain agencies are so aligned with interpreting and enforcing the State's policies that the rationale of the *McKinney* doctrine simply does not apply. In holding that the Consumer Protection Division may seek appellate review of an adverse circuit court ruling, Judge Eldridge, writing for the Court, observed:

> "The Consumer Protection Division exercises a broad range of functions including rule making, investigating and prosecuting alleged violators of the statute, and holding cease and desist order hearings. * * * With its many different functions, its mandate to protect consumers and its role as a

---

3. This principle has also been referred to as the *McKinney–Peco* doctrine in light of *Md. Board of Pharmacy v. Peco*, 234 Md. 200, 198 A.2d 273 (1964), in which we held that the Board of Pharmacy lacked standing to appeal. 234 Md. at 202, 198 A.2d at 273 (noting that the "Board's function in acting upon an application for permit under the statute is quasi-judicial and not adversary").

representative of the interests of the State, the Division is not the type of agency to which the rationale of *McKinney* applies."

*Id.* Therefore, we consider characteristics such as the authority to adopt rules, investigate complaints, prosecute violators, and issue orders in furtherance of the public interest in determining whether the *McKinney* limitation on the right to appeal is applicable to an agency. Since adopting these criteria, we have found the *McKinney* doctrine inapplicable to such agencies as the Maryland Racing Commission, *see Maryland Racing Com'n v. Castrenze,* 335 Md. 284, 295, 643 A.2d 412, 417 (1994); the Real Estate Commission, *see Maryland Real Estate Comm'n v. Johnson,* 320 Md. 91, 97, 576 A.2d 760, 763 (1990); and the Department of Human Resources, *see Maryland Department of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 585–86, 565 A.2d 1015, 1020–21 (1989), *cert. denied, Cassilly v. Maryland Dep't of Human Resources,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990). In each case, we were satisfied that the agency possessed characteristics sufficiently similar to those referenced in *Consumer Protection* that *McKinney* did not apply.[4] We now reach the same conclusion here with regard to the Liquor Board.

■ Like the Consumer Protection Division, the Liquor Board has rule making, investigatory, and prosecutorial authority. *See* §§ 16–301(a)(conferring power to adopt rules and regulations) and 10–403(a)(providing authority to revoke or suspend licenses after notice and hearing). Furthermore, the Maryland legislature has declared:

"(a) *Regulation necessary.*—(1) It is the policy of the State of Maryland that it is necessary to regulate and control ...

---

**4.** It should be noted that the legislature has expressly rejected *McKinney* with respect to those agencies subject to the contested case provisions of the Administrative Procedure Act (APA) by amending Md.Code (1984, 1995 Repl.Vol.), State Government Art., § 10–223(b)(2) to expressly permit agency appeal of circuit court judgments. While we mention this amendment to demonstrate legislative disfavor of the *McKinney* doctrine, it is not necessary for us to determine whether the Liquor Board is subject to those portions of the APA and we do not reach that question.

alcoholic beverages ... to obtain respect and obedience to law and to foster and promote temperance.

(2) It is the legislative intent that that policy will be carried out in the best public interest by empowering the Comptroller of the Treasury, the various local boards of license commissioners and liquor control boards, all enforcement officers and the judges of the various courts of this State with sufficient authority to administer and enforce the provisions of this article.

(3) The restrictions, regulations, provisions and penalties contained in this article are for the protection, health, welfare and safety of people of this State."

§ 1–101. This statute reflects a legislative intent that the various liquor boards represent the interests of the public and the State in carrying out their duties. In this respect as well, the Liquor Board resembles the Consumer Protection Division. These similarities, coupled with the statutory changes providing for an expanded right of appeal, lead us to the conclusion that the Liquor Board has standing to appeal an adverse decision by the circuit court. Since *Leone* is inconsistent with this conclusion, it is overruled.

## III.

The second issue is whether the Liquor Board exceeded its authority in restricting the hours of lawful operation of the licensee's nightclub. Although this sanction is not expressly authorized by statute, the Liquor Board contends that it falls within the scope of the Board's general regulatory authority. Specifically, the Liquor Board argues that its broad rule making authority justifies its restricting the hours of operation by a licensee. Because the restriction purportedly promotes the welfare and safety of the community, the Liquor Board asserts that it furthers the stated policy goals of Article 2B. This position ignores the fact, however, that regardless of any rule making authority that the Liquor Board might enjoy, it may not impose a sanction that exceeds the confines of its expressly or impliedly delegated powers. Even in cases where we have recognized broad delegations of au-

thority, we have emphasized that agency rules and regulations must conform to the language and spirit of the statute under which the agency acts. *See, e.g., Fogle v. H & G Restaurant,* 337 Md. 441, 453, 654 A.2d 449, 455 (1995). As we observed in *Sullivan v. Bd. of License Comm'rs,* 293 Md. 113, 124, 442 A.2d 558, 564 (1982), "the power . . . to make rules is not the power to make laws."

"[I]n determining whether a[n] . . . administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling." *Lussier v. Md. Racing Comm'n,* 343 Md. 681, 686, 684 A.2d 804, 806 (1996). Where the legislature has properly and broadly delegated regulatory authority to an agency, we have quite liberally construed the scope of the agency's implied powers to act in that area. *See, e.g., Christ v. Maryland Department of Natural Resources,* 335 Md. 427, 440, 644 A.2d 34, 40 (1994) (holding that a Department of Natural Resources (DNR) regulation imposing a minimum age requirement for operating personal watercraft was a proper exercise of the DNR's statutory authority to adopt regulations "governing the operations" of water vessels); *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) (holding that the Inmate Grievance Commission had authority to make monetary awards to an inmate as long as funds are appropriated or otherwise properly available, despite the fact that this particular remedy was not statutorily prescribed). Notwithstanding this general trend, however, an agency may not take action "which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, impairs, limits, or restricts the act being administered." *Insurance Comm'r v. Bankers,* 326 Md. 617, 624, 606 A.2d 1072, 1075 (1992). A determination of the scope of an agency's powers, therefore, turns on the General Assembly's intent in empowering the agency and the statutory scheme under which the agency acts. In this case, such considerations preclude a finding that the Liquor Board had implied authority to restrict the licensee's hours of Sunday operation.

This Court has previously explained that "[i]n any particular area of legislative concern, whether there should be a broad general delegation of regulatory authority to administrators, or a more specific delegation, is a choice for the General Assembly." *Christ,* 335 Md. at 439, 644 A.2d at 39. " 'In the field of regulatory law, more attention has perhaps been given by legislatures to the control and management of the liquor business than of any other traffic. . . .' " *Dundalk Liquor Co. v. Tawes,* 201 Md. 58, 65, 92 A.2d 560, 563 (1952) (citation omitted) (quoting *Miller v. State,* 174 Md. 362, 371, 198 A. 710, 715 (1938)). The Maryland General Assembly, under Article 2B, indeed regulates the sale and distribution of alcoholic beverages with uncommon precision:

> "The provisions of Art. 2B cover a myriad of subjects. They include the typical controls on the sale and consumption of alcoholic beverages, such as the types of places which may be licensed, the types of beverages which may be sold, the hours of sale, the license fees, etc. The subjects covered in Art. 2B also include regulations concerning the premises, the conduct of licensees, ownership of establishments, membership requirements for association or club licensees, etc. For examples, Art. 2B contains provisions dealing with the nature of kitchen equipment and kitchen facilities for the preparation of food on the premises of licensees, the size of dining rooms, sanitary and health conditions relating to the preparation of meals, the minimum number of rooms to qualify for a hotel license, landscaping and gardens for certain types of licensees, the clothing to be worn by employees of a licensee, the number of stories and elevators in a building to qualify for a hotel license, the size of parking facilities, restrictions on music, requirements concerning curtains on windows, the noise level of music, citizenship requirements for licensees, the number of boat slips for a yacht club to qualify for a license, the number of tennis courts and the size of the swimming pool to qualify for a country club license, and specific membership requirements for armed forces veterans clubs,

fraternal clubs, etc., to be eligible for licenses." (Citations omitted).

*Coalition v. Annapolis Lodge*, 333 Md. 359, 371–72, 635 A.2d 412, 418 (1994). Rather than providing broad general guidelines, the General Assembly has chosen to closely control by statute even the more detailed aspects of the alcoholic beverages industry. This close regulation is perhaps partly due to the fact that, unlike other regulated areas, there is not a single agency that administers the alcoholic beverages law, but rather numerous local boards that are charged with its enforcement. Regardless of the reason for its enactment, the result of such a comprehensive statutory scheme is that the authority of the administering agencies necessarily is more circumscribed than the typical administrative body. The Liquor Board thus differs fundamentally from those agencies to which the legislature more generously delegates the particulars of a regulatory scheme.

The less exacting legislative treatment of the horse racing industry, as compared to the liquor industry, distinguishes our recent decision in *Lussier v. Md. Racing Comm'n, supra.* In *Lussier*, we examined the authority of the Maryland Racing Commission to impose a $5,000 fine on a racehorse owner for violation of the Commission's racing regulations. *Lussier*, 343 Md. at 682, 684 A.2d at 804. The owner challenged the fine on the ground that the Racing Commission lacked specific statutory authorization to impose monetary penalties. *Lussier*, 343 Md. at 684, 684 A.2d at 805. In rejecting the owner's argument, we noted that the Racing Commission has broad authority to regulate racing, and we determined that the legislature intended regulation to extend to owners, trainers, jockeys, and similar individuals, even though the statutes are silent in this regard. *Lussier*, 343 Md. at 696–699, 684 A.2d at 811–812. We stated that "[i]t is inconceivable that the General Assembly intended to grant broad authority to the Commission to regulate the conduct of these individuals, but did not intend that the Commission be able to enforce its regulations by sanctions." *Lussier*, 343 Md. at 700, 684 A.2d at 813. Under this general blanket of authority, we held that the Racing

Commission has the implied power to impose fines on wrong-doers without running afoul of the purpose, language or spirit of the statute under which it acts. *Lussier,* 343 Md. at 695–700, 684 A.2d at 811–813.

The General Assembly has not taken the same approach, however, toward regulating the hours of establishments operated by alcoholic beverages licensees. In fact Article 2B contains a section devoted entirely to the hours and days during which alcoholic beverages may be sold in the various jurisdictions. The provisions in this section establish hours of sale for several different classes of Baltimore City licensees. *See, e.g.,* § 11–302(b)(2) (Class B beer and light wine license); § 11–303(d)(2) (Class D beer, wine and liquor license); § 11–503(a) (amusement license). With regard to Class B–D–7 licensees in particular, § 8–203(d)(3) [5] provides that the "[l]icensees may sell all alcoholic beverages at retail at the place in the license described, for consumption on the premises and elsewhere, from 6 a.m. to 2 a.m. on the following day, 7 days per week." It is significant that, at the time that the sanction was imposed on the licensee in this case, none of the provisions related to Baltimore City contained an express or implied grant of authority to the Baltimore City Liquor Board to restrict or modify the legislatively designated hours.

The Baltimore City provisions should be contrasted to § 11–517(i), providing that:

"In the 24th alcoholic beverages district of Prince George's County as described in § 9–217(*l*) of this article, notwithstanding any other provision of this article, *the Board of License Commissioners may change the closing hour and*

---

**5.** Section 8–203 is not included in the *Hours and Days For Sale* title of Article 2B, but rather appears in the title that establishes local licenses. The class B–D–7 license is unique to Baltimore City and is subject to all other provisions of Article 2B that pertain to Baltimore City and that are not inconsistent with that section. § 8–203(d)(6).

*reduce the hours of sale of any licensee,* under any class of alcoholic beverages license:

(i) On receipt of a bona fide complaint concerning the licensed premises; and

(ii) After a hearing on the complaint." (Emphasis added).

By including this language, the General Assembly has expressly granted the Prince George's County Liquor Board the power to modify the hours of sale and has established the procedural prerequisites for so doing. A similar provision is conspicuously absent from the sections that govern Baltimore City. It seems reasonable to conclude that if the legislature had intended the Baltimore City Liquor Board to have this authority, it would have incorporated language to that effect in the appropriate provisions.[6]

Article 2B also sets forth with particularity the potential penalties that may result from a licensee's noncompliance with the restrictions and requirements of the article. In general, there appear to be three sanctions to which the General Assembly intends the liquor boards to resort in the appropriate circumstance: monetary fines, license suspension, and license revocation. All liquor boards have the authority, pursuant to § 10–401, to revoke or suspend a license upon the occurrence of certain enumerated events. In addition, Article 2B prescribes various monetary penalties that may be imposed. For example, where a violation constitutes cause for license suspension, the Baltimore City Liquor Board may fine a licensee not more than $500 for a first offense and $1,000 for any subsequent offense, while the Carroll County and Caroline County liquor boards may impose fines not in excess of $2,000 and $2,500, respectively. § 16–507(d),(h), (g). Furthermore,

---

6. Subsequent to the commencement of this action, the General Assembly modified §§ 11–301, 11–302, 11–303, and 11–305 to permit the Baltimore City Board of License Commissioners to restrict, by regulation, the hours and days for the sale and consumption of alcohol. This revision may ultimately be applied to resolve the dispute between the parties in this case. We nevertheless proceed under the law applicable at the time the restrictions in the instant case were imposed.

while in Carroll County, the imposition of a fine is an alternative to license suspension under this provision, Caroline County authorities may impose a fine in conjunction with license suspension. § 16–507(h),(g). There are also specific enforcement tools available to different jurisdictions under Article 2B. For example, the liquor boards in certain counties and Baltimore City have the power to issue summonses for witnesses to testify at authorized hearings and inquiries, *see* § 16–410; while in Calvert County, the liquor board must inspect licensed premises every three months, *see* § 16–402.

As these provisions illustrate, Article 2B precisely establishes the sanctions available to a liquor board in responding to a licensee's misconduct. Such an elaborate statutory scheme suggests a specific, rather than broad, delegation of authority to the liquor boards and contradicts the notion that restrictions, penalties, and sanctions may be fashioned on an *ad hoc* basis. An exception, of course, exists where the licensee consents and agrees to a reasonable restriction, as discussed in the decision of this Court in *Board of Liquor License Commissioners v. Fells Point Cafe, Inc.*, 344 Md. 120, 685 A.2d 772 (1996). In the instant case, however, there was no agreement between the parties.

In sum, the statutory scheme under which the Liquor Board acts limits its authority to modify a licensee's hours of operation. The legislature has specifically designated the hours during which alcoholic beverages may be sold and did not confer upon the Baltimore City Liquor Board the power to deviate from those provisions. Furthermore, the General Assembly's detailed regulation of the alcoholic beverages industry suggests that where it intends a liquor board to have a particular enforcement mechanism at its disposal, the General Assembly expressly provides for such mechanism by

statute. Accordingly, we find the Liquor Board lacking in explicit or implicit authority to sanction the licensee by restricting its hours of operation.[7]

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

---

7.   We need not consider whether the circuit court was correct in relying on the fact that the conduct complained of did not occur on the licensee's premises.