705 A.2d 16

**BOARD OF LIQUOR LICENSE COMMISSIONERS
FOR BALTIMORE COUNTY**

v.

**J.R. BROTHERS, INC. t/a The Turf Inn, et al.**

No. 809, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Jan. 16, 1998.

Harrell, J., concurred and filed opinion.

Gregory Gaskins (Virginia W. Barnhart and Barry A. Butanis, on the brief), Towson, for appellants.

Roger J. Sullivan (F. Vernon Boozer and Covahey & Boozer, P.A., on the brief), Towson, for appellees.

Argued before HARRELL, EYLER and KENNEY, JJ.

EYLER, Judge.

The question presented by this appeal is whether the Board of Liquor License Commissioners for Baltimore County (Board), appellant, exceeded its statutory authority because of the nature of the sanction imposed against a licensee, J.R. Brothers, Inc. t/a The Turf Inn (The Turf Inn), appellee. We answer that question in the affirmative.

## Facts

The Turf Inn is a restaurant and bar located in Baltimore County. The Board had previously issued a Class B (restaurant) beer, wine, and liquor license for the premises. The Turf Inn sent a letter dated March 16, 1995, to the Board, requesting permission to build a 1,200 square foot deck for dining, which was to be attached to its existing building. The Board advised The Turf Inn to file an application. The Turf Inn sent another letter to the Board, dated March 24, 1995, enclosing a plat showing the existing building, parking, and the proposed deck. The stated purpose of the deck was for "light dining and/or crabs along with an outside smoking area." Pursuant to the Board's local rules, The Turf Inn filed

an application dated April 21, 1995, in which it applied for permission to increase the licensed premises by the addition of a "1,200 square foot outside deck."

The Board held a hearing on May 22, 1995, and at the conclusion of the hearing, approved "this plan." At the hearing, the following colloquy occurred between Anthony J. DiPaolo, one of the individual licensees, and the licensees' counsel:

Q. What exactly do you intend to do with this deck space? I understand the panel has a copy of the plans that you have drawn for this project. What exactly do you want to do on this deck?

A. It's mainly for light fare dining and possibly crabs on the weekend. That's primarily it.

Q. Also, do you want to use it as an outside smoke area?

A. That's when it first came up, because of the smoke ban I thought was going to go into effect.

Q. And you're here to petition this Board because you'd like to serve alcohol on that deck throughout—like you do throughout the restaurant?

A. Yes, sir.

Q. What is your percentage of food revenues to alcohol revenues?

A. Eighty percent food, 20 percent liquor.

Q. Do you expect it will be the same on the deck?

A. Oh, yes.

Q. How do you expect to deliver alcohol onto the increased space onto the deck?

A. We are going to have two servers along with a couple bus boys, and possibly somebody on the deck to watch and maintain the deck.

Q. You have to bring alcohol from the existing bar to the deck?

A. That's correct.

Q. Do you expect you might have a small service bar on the deck?[1]

A. It depends on our customer demand. We were thinking probably having a frozen drink cart possibly coming out. That's about it.

There were no additional questions or comments by the Board at the hearing with respect to the method of serving alcohol on the deck.

Several months later, the Board received a complaint that (1) The Turf Inn had constructed a deck 400 square feet larger than had been requested on its plans as approved,(2) had installed a permanent bar on the deck, and (3) was offering live music after 11:00 p.m. The Board conducted a hearing on August 19, 1996, for The Turf Inn to show cause why it was not in violation of Article 2B, §§ 10–401 and 10–403 and the Board's local rules.[2] At the conclusion of the hearing, the Board ordered that the permanent bar on the deck (not depicted on the previously approved plans) be removed, that no live music be offered on the deck after 11:00 p.m., and that the 400 square foot addition be removed or, in the alternative, that The Turf Inn pay a fine of $400. The Turf Inn paid the fine, agreed to the restriction on live music, but appealed to the Circuit Court for Baltimore County that portion of the Board's order requiring removal of the deck bar.

By memorandum and order dated March 18, 1997, the circuit court reversed the decision of the Board requiring removal of the bar on the ground that the order exceeded the Board's statutory authority.

---

1. The plans submitted to the Board by the licensees did not depict any bar on the proposed deck addition.

2. Local Rule 15, the only rule relevant to the issue on this appeal, provides:

ALTERATIONS OR CHANGES TO PREMISES

All alterations or changes in the physical design of licensed establishments must be first approved by the Board of Liquor License Commissioners for Baltimore County and the Building Engineer of Baltimore County.

## Question Presented

The parties present one question which, as rephrased by us, inquires whether the circuit court erred in reversing that portion of the Board's order requiring removal of the outside bar on the ground that the Board exceeded its statutory authority.

## Standard of Review

The standard of review is governed by Md. Ann.Code Art. 2B, § 16–101(e), which provides in part:

(1)(i) Upon the hearing of such appeal, the action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local licensing board's discretion in rendering its decision was not honestly and fairly exercised, or that such decision was arbitrary, or procured by fraud, or unsupported by any substantial evidence, or was unreasonable, or that such decision was beyond the powers of the local licensing board, and was illegal.

This Court's review of the Board's decision is the same as that of the circuit court. If the Board's decision is supported by substantial evidence, and if it committed no error of law, we must reverse the circuit court and affirm the Board's decision. If the Board's decision is not supported by substantial evidence, or if it did commit an error of law, we must affirm the circuit court. *See* Art. 2B, § 16–101(e)(4) (insofar as Baltimore County is concerned, the court may only affirm, reverse, or modify the action of the licensing board).

## Discussion

Both parties to this appeal rely on the following trilogy of cases: *Board of Liquor License Commissioners for Baltimore City v. Fells Point Cafe,* 344 Md. 120, 685 A.2d 772 (1996); *Board of Liquor License Commissioners for Baltimore City v. Hollywood Productions, Inc.,* 344 Md. 2, 684 A.2d 837 (1996); and *Sullivan v. Board of License Commissioners for Prince*

*George's County,* 293 Md. 113, 442 A.2d 558 (1982). Appellee asserts that the cited cases stand for the general proposition that the penalties liquor boards may impose on licensees for noncompliance with lawful requirements are limited to those set forth in Article 2B, namely, monetary fines, license suspension, and license revocation. The Board does not disagree with that general proposition but points out that a different result follows when a licensee consents to a restriction. It argues that this case falls within that exception. The Turf Inn acknowledges the exception but counters by asserting that it did not consent to the restriction in question.

We look to the record to resolve that dispute, but first we review the applicable law. Article 2B regulates and controls "the manufacture, sale, distribution, transportation and storage of alcoholic beverages within this State and the transportation and distribution of alcoholic beverages into and out of this State...." Art. 2B, § 1–101(a)(1). The various boards of liquor license commissioners (liquor boards) are empowered to adopt and enforce regulations to further the purpose of the statute. *See* Art. 2B, §§ 1–101(a)(2), 1–101(b), and § 16–301.

In *Hollywood,* one of the issues before the Court of Appeals was whether the liquor board exceeded its authority in restricting the hours of lawful operation of the licensee's nightclub because its patrons, after exiting the licensed premises, were disturbing the peace of the surrounding residential neighborhood. Although the sanction was not expressly authorized by statute, the liquor board contended that it fell within the scope of the board's general regulatory authority. 344 Md. at 10, 684 A.2d 837. In answering that contention, the Court first noted that none of the provisions in Article 2B specifically applicable to Baltimore City contained an express or implied grant of authority to the Baltimore City Liquor Board to restrict or modify the specific hours of operation permitted by the statute for the type of license involved. *See* Art. 2B, §§ 11–302(b)(2), 11–303(d)(2) and 11–503(a). The Court contrasted the provisions applicable to Baltimore City with the provisions applicable to Prince George's County and noted that the Prince George's County board was given ex-

press authority by the General Assembly to change the closing hour and reduce the hours of sale of any licensee after receipt of a complaint and a hearing. The Court then stated:

Article 2B also sets forth with particularity the potential penalties that may result from a licensee's noncompliance with the restrictions and requirements of the article. In general, there appear to be three sanctions to which the General Assembly intends the liquor boards to resort in the appropriate circumstance: monetary fines, license suspension, and license revocation. All liquor boards have the authority, pursuant to § 10–401, to revoke or suspend a license upon the occurrence of certain enumerated events. In addition, Article 2B prescribes various monetary penalties that may be imposed. For example, where a violation constitutes cause for license suspension, the Baltimore City Liquor Board may fine a licensee not more than $500 for a first offense and $1,000 for any subsequent offense, while the Carroll County and Caroline County liquor boards may impose fines not in excess of $2,000 and $2,500, respectively. § 16–507(d),(h),(g). Furthermore, while in Carroll County, the imposition of a fine is an alternative to license suspension under this provision, Caroline County authorities may impose a fine in conjunction with license suspension. § 16–597(h),(g). There are also specific enforcement tools available to different jurisdictions under Article 2B. For example, the liquor boards in certain counties and Baltimore City have the power to issue summonses for witnesses to testify at authorized hearings and inquiries, see § 16–410; while in Calvert County, the liquor board must inspect licensed premises every three months, see § 16–402.

As these provisions illustrate, Article 2B precisely establishes the sanctions available to a liquor board in responding to a licensee's misconduct. Such an elaborate statutory scheme suggests a specific, rather than broad, delegation of authority to the liquor boards and contradicts the notion that restrictions, penalties, and sanctions may be fashioned on an *ad hoc* basis. An exception, of course, exists where the licensee consents and agrees to a reasonable restriction,

as discussed in the decision of this Court in *Board of Liquor License Commissioners v. Fells Point Cafe, Inc.*, 344 Md. 120, 685 A.2d 772 (1996). In the instant case, however, there was no agreement between the parties.

*Hollywood*, 344 Md. at 14–15, 684 A.2d 837.

In *Hollywood*, the violation, as found by the liquor board, was of a rule requiring licensees to avoid disturbing the peace, health, and welfare of the community. There was no challenge to the power of the Board to find such a violation, but the challenge was to the sanction imposed. In response to complaints, the liquor board for Baltimore City ordered the licensee to close on Sundays at 7:00 p.m. The sanction imposed was not expressly authorized by statute. The Court of Appeals affirmed the circuit court and held that the Board exceeded its power in imposing the sanction.

In *Fells Point Cafe*, as part of their effort to obtain approval for the transfer of a liquor license, the licensees agreed with the Fells Point Homeowners Association to certain restrictions on the operation of their business in exchange for the Association's agreement not to oppose the transfer. Certain of those restrictions limited the licensees' operations in ways otherwise allowed by provisions of Article 2B. The Baltimore City Liquor Board granted the application subject to the restrictions contained in that agreement. Subsequently, the board held a hearing to determine if the restrictions had been violated. It found that they had and imposed additional restrictions.

The Court of Appeals stated that it is reasonable to infer that the General Assembly did not intend all liquor boards to have the power to place restrictions on a license as an enforcement mechanism because it did not so state in Article 2B. The Court went on to hold, however, that a liquor board may impose restrictions on a license with the uncoerced consent of the licensees. The Court noted that such power is not itself without restriction and left the determination of its parameters to another day. It did state that a liquor board (1) may not use its power to grant or transfer a license or to coerce acceptance of restrictions, and (2) that all restrictions

agreed to are not necessarily valid. In the case before the Court, Fells Point Cafe conceded that the restrictions were voluntary, and the reasonableness of the restrictions was not an issue. 344 Md. at 141, 685 A.2d 772.

In the third case, *Sullivan,* the Court of Appeals had before it the question of whether the Board of License Commissioners for Prince George's County had acted within its authority in denying a licensee's application to construct and operate a drive-in window for the sale of packaged alcoholic beverages on the licensed premises. In *Sullivan,* the licensee had a license to sell packaged alcoholic beverages but had applied for permission to expand its premises, including the addition of a drive-in window. The Prince George's County Liquor Board approved the expansion but denied the request for a drive-in window based on a finding that it would be harmful to the health and welfare of the community. After affirmance by the circuit court, the Court of Appeals reversed and remanded. The Court pointed out that then Article 2B, § 38(a)(5) permitted the Prince George's County Board to adopt rules concerning alterations and additions to licensed premises, and the Board had in fact adopted such a rule. The Court, while recognizing the legitimate authority of the liquor board to regulate alterations or additions to the licensed premises, stated that drive-in windows are not inherently detrimental. Consequently, they may be prohibited only if necessary to protect the peace, safety, and welfare of the community. The Court remanded the case to the liquor board, because it was not clear if the liquor board had denied the request on that basis or in the belief that it could prohibit drive-in windows as a board policy.

In the case before us, the construction of a permanent bar was not reflected in the correspondence with the Board, in the application, or on the plans. The only evidence with respect to The Turf Inn's intention as to the manner of serving alcoholic beverages on the proposed deck was in response to its attorney's questions at the May 22, 1995 hearing. When asked if there was an intent to have a small

service bar, one of The Turf Inn's licensees answered that it depended on customer demand, but they were thinking about a frozen drink cart.

It is clear, therefore, that there was never a request by The Turf Inn to the Board to approve the construction of a permanent bar on the deck, and the Board never had to consider, nor did it consider, such a request. Thus, we do not have before us an express consent to a restriction imposed by the Board, which could be specifically enforced even though not within the Board's express list of available sanctions, as was the case in *Fells Point Cafe.*

The Board contends that The Turf Inn conceded at the August 19, 1996, hearing that, at the May 22, 1995 hearing, it "consented to voluntary restrictions concerning the service of alcohol on the outdoor deck." The transcript of the 1996 hearing reveals the following exchange:

Q. (Turf Inn's Counsel)

Could you go in with your plans and things leading up to the first hearing where you asked for a deck and you presented plans, discussed the plans, and why they changed somewhere along the line.

A. (Turf Inn's Representative)

Originally we requested a thirty by forty deck because of finances, and that's what we went ahead and did. And as my brother testified, we weren't a hundred percent sure exactly what we were going to do. We were going to wait and see how it worked out with the customers and all that. And we were going to possibly, like my brother said, have a frozen drink cart or service bar area.

And it just ended up that the Health Department came in and said if you're going to have any kind of, you know, service bar area out here, you have to have a sink, you have to have proper drainage. And so we went ahead and built the sink with the proper drainage, had the soda guns out there as the Health Department—

THE CHAIRMAN: Didn't you think about the Liquor Board?

[TURF INN'S REPRESENTATIVE]: Well, we thought it was the—basically the idea that had to be approved. We didn't think each detail had to be approved.

THE CHAIRMAN: You thought you could go in there, request one size deck, get it in there, and put whatever size you wanted?

Then you decided you may have a little drink cart going back and forth and because you've got the bar three or four feet inside the door, and you decided to put a big bar up there without notifying the Board?

[TURF INN'S REPRESENTATIVE]: No, sir. We thought that we'd put the service bar up there. It's not that big a bar. And we thought the concept was that we could have booze out there and it was okay, you know, as the Liquor Board approved booze being served out there.

And we thought that, you know, that was what really had to be approved, and that, you know, the size of the service bar was basically, you know, irrelevant.

\* \* \* \*

Q. On the service bar, there was testimony previously they were going to put something out there to serve the customers there. You said the Health Department required you to do what?

A. Basically, yes, the Health Department required for us to have hot and cold running water, proper drainage.

THE CHAIRMAN: The little cart with the frozen drink cart, did the Health Department make you do that?

THE WITNESS: I was under the impression we had asked for a possible service bar or a cart. Maybe he didn't say service bar, but that was our intention, to have a cart or a service bar area so the waitresses could get their drinks and such.

Q. Did you try the less formal setup without the sink and the plumbing that you eventually built? How did it evolve from just a little informal thing to what you say the Health Department required?

A.  Because as you're getting through, all the inspectors have to come out and, in effect, see it's up to par.  And when the Health Department said the service bar needed to have a sink, I needed to have proper running hot and cold water—

Q.  So you were following the Health Department requirements?

A.  Yes.

Q.  But you didn't come back and ask the Liquor Board for this?

A.  No, sir.

Q.  Is that just an oversight?

A.  No doubt about it.

Q.  Did you intentionally do this just to thwart the regulations and the rules that require you—

A.  Absolutely not.  Absolutely not.  We have gone through all the steps that were required.  And we weren't trying to get around anything.  You know, we were trying to go through the proper channels.

We just weren't—when we were building, we just weren't a hundred percent sure what we wanted to do ourselves as we were building it.

We cannot read a concession by appellee into that colloquy. To the contrary, we infer just the opposite.  Consequently, we discuss the general powers of the Board in the absence of a consensual restriction on a license.

Article 2B and the restrictions, regulations, provisions, and penalties contained therein are declared to be for the "protection, health, welfare and safety of this State."  Art. 2B, § 1–101(a)(3).  Liquor boards are generally empowered to administer and enforce its provisions.  Art. 2B, § 1–101(a)(2).  Certain provisions in Article 2B grant general powers to all liquor boards, and other provisions grant specific powers that vary from jurisdiction to jurisdiction.  One of the general powers granted to the boards is the general power to adopt reason-

able rules and regulations necessary to discharge their duties under Article 2B. *See* § 16–301.

█ While Article 2B does not expressly grant the Board the power to regulate an alteration or expansion of licensed premises as was true for the Prince George's County board in *Sullivan,* the Turf Inn does not challenge the power of the Board to do so. In addition, the power to regulate an alteration or addition to premises exercised by the Board in this case is not inconsistent with express statutory provisions as was the case in *Hollywood.* Consequently, the Board's right to regulate the alteration or addition to premises rests on the general power to protect the public health, welfare, and safety.

█ Similar to the drive-in window in *Sullivan,* the existence of an outside bar is not inherently detrimental. It may be detrimental only if such a finding is supported by evidence that it is inconsistent with the health, welfare, and safety of the people of this State. The Board, therefore, would not have the power to prohibit the construction of an outside bar, simply as a matter of Board policy without an appropriate finding, either as a restriction on the grant of authority to expand the premises, had it been requested, or as a matter of enforcement.[3]

---

**3.** With respect to alterations or additions to licensed premises, we note that the provision in Article 2B applicable to Baltimore County differs from that applicable to Prince George's County. Article 2B § 15–112(f)(2) applies to Baltimore County and, in pertinent part, provides:

In Baltimore County, in addition to the other powers and duties conferred on them, the Board of License Commissioners may prescribe rules and regulations ... concerning the granting and the date of issuing licenses when the actual use of the license is to be deferred until the completion of construction work or alterations on the premises.

Article 2B § 8–217(a)(4) applies to Prince George's County and provides:

In Prince George's County, in addition to the other powers and duties conferred upon them, the Board of License Commissioners may prescribe rules and regulations concerning the granting and the date of issuing licenses when the actual use of the license is to be deferred until the completion of construction work or alteration on the premis-

The violation found by the Board in this case was that The Turf Inn engaged in an activity without permission. There was no other finding. There was not an agreed restriction which would permit specific enforcement as in *Fells Point Cafe*; the issue was never addressed. The power of the Board to find a violation is not challenged. Assuming the Board had the general power to find a violation of Rule 15, the question then turns to the nature of the available sanctions.

As part of its enforcement power, the Board may impose a fine, suspend a license, or revoke a license. It may suspend or revoke a license only if there is cause for suspension or revocation under the alcoholic beverage laws and the rules and regulations affecting Baltimore County. A license may be suspended or revoked for any cause necessary to promote the peace or safety of the community. *See* §§ 10–401 and 16–507(e). Pursuant to § 16–507(e), the Board could impose a fine not exceeding $2,000 on finding a violation but could not suspend or revoke the license absent a finding in accordance with the above statement.

In summary, had permission for an outside permanent bar been requested, the Board would have had the power to

---

es; **and further, said Board may prescribe rules and regulations concerning alterations and additions to any licensed premises and the use thereof;** the provisions hereof shall not be construed to prevent the issuance, or renewal, of a license previously issued, or authorized for issuance, where the premises licensed or to be licensed are under construction or the alterations to made therein are in progress. (Emphasis added).

By examining the two statutes, it is clear that although the State has conferred to Prince George's County the express authority to regulate alterations to licensed premises, it has not adopted a similar provision for Baltimore County. The express authority conferred on the Prince George's County board, however, is not without limits. As determined in *Sullivan*, Prince George's County can prohibit alterations or additions to licensed premises only if necessary to protect the peace, safety, and welfare of the community. *Sullivan*, 293 Md. at 118–119, 442 A.2d 558; *see also* § 1–101(a)(3). Since a finding of harm must be made in Prince George's County, then common sense dictates that a similar finding must also be made in Baltimore County because the power of its Board to regulate alterations and additions to licensed premises is contained in the general power to regulate and not expressly provided for by statute.

impose that restriction, absent express consent, only if evidence supported a finding that it was not in the interest of the public health, safety, and welfare. There was no express consent which might have been capable of specific enforcement. With respect to the violation of the Board's rule for going beyond the scope of the permission requested and granted, the Board had the power to impose a fine and had the power to suspend or revoke the license upon an appropriate finding. There was no finding by the Board other than the fact that The Turf Inn constructed a permanent outside bar without permission. The Board has no power to order removal of the bar.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

HARRELL, J., files a concurring opinion.

HARRELL, Judge, concurring.

Although I agree with my colleagues' conclusion that the circuit court's judgment should be affirmed, I write separately solely because I do not accept their intermediate reasoning that the licensees' testimony regarding the extent of the proposed alteration of the licensed premises did not amount to a consensual restriction (maj. op. at 319, 705 A.2d at 22) of the type discussed in *Fells Point Cafe. See Fells Point Cafe*, 344 Md. at 137–41, 685 A.2d 772. I believe the majority strays in its analysis when it focuses, for purposes of deciding this point, on the highlighted testimony from the 16 August 1996 show cause violation hearing, rather than on the 22 May 1995 hearing regarding the scope of the original request to alter the licensed premises.

Appellee conceded at oral argument that Local Rule 15, for present purposes, is a lawfully enacted requirement. It does not take extensive inquiry into the legislative intent of Art. 2B or Local Rule 15 to divine that the general public health, safety, and welfare (and the specific implications related thereto of regulating the manner and place of the sale and consumption of alcoholic beverages) are served by requiring

licensees to submit for consideration and approval their specific plans proposing to alter the size of the licensed premises and/or the operational modalities for the purveying of alcoholic beverages as defined previously when the license was issued, transferred, or renewed.

A failure to recognize and honor this regulatory linkage could impair a local board's ability to enforce Art. 2B. For example, in the present case, if the licensees were not required to obtain prior Board approval before installing the deck and placing it in service, alcohol might be served to minors on the deck, which deck area could be argued not to be a part of the licensed premises theoretically and, thus, as off-premise activity, beyond Board regulation. The need for specificity and accountability regarding premises modification situations seems obvious.

Turning to the relevant testimony of the licensee before the Board on 22 May 1995, although understandably "flexible" from a businessperson's perspective, I view it, when taken together with the actual plans submitted with the application, as amounting to the *equivalent* of a consensual limitation on the licensees' method of purveying alcohol to patrons on the proposed deck. As such, the majority errs in not concluding likewise. Had the majority reached the conclusion I reach on this score, its analysis thereafter should have been directed to determining whether the consensual restriction was of a kind contemplated by *Fells Point Cafe* as possibly not valid. *See Fells Point Cafe*, 344 Md. at 141, 685 A.2d 772.

In further support of my view that the instant case qualifies as the *equivalent* of a consensual restriction, I point out that Mr. DiPaola's equivocal testimony of 22 May 1995 regarding the proposed methods of dispensing alcohol to deck patrons in no sense can be construed as amending the actual plans which were the basis of the licensees' application and the Board's express approval. The best that can be said about his testimony regarding the possibility of a "small service bar" on the deck is that the potential for such depended on future interpretation of then unknown "customer demand," a consider-

ation that inherently mixes subjective and objective factors. For the present, however, alcohol service to deck patrons was to be from the existing interior bar or a mobile frozen drink cart. Hence, the plans for which approval was sought depicted no permanent deck bar.[4] These inducements, dangled by the licensees and their attorney before the Board, are an uncoerced proffer similar to the consensual restrictions discussed in *Fells Point Cafe*. It is of no consequence that the Board, in approving "this plan," did not express its reliance, or right to rely, on the licensee's testimony by conditioning its approval expressly with a relevant negative restriction, limitation, or condition (e.g., licensees may not have a permanent service bar on the deck). The Board approved a "plan" with no fixed service bar on the deck because none was proposed. Read together with the testimony of 22 May 1995, the "plan" is thus the functional *equivalent* of a consensual restriction within the meaning of *Fells Point Cafe*.

I hasten to add that, nonetheless, I reach the same result as the majority and the circuit court because I believe the Court of Appeals, in interpreting the legislative intent of Art. 2B, has held clearly that local boards, unless granted powers therein to the contrary, may only enforce violations of Art. 2B and/or the validly enacted local rules through fines, suspension of licenses, or revocation of licenses. *See Hollywood Productions,* 344 Md. at 15, 684 A.2d 837; *Fells Point Cafe,* 344 Md. at 136–37, 685 A.2d 772.

---

4. It seems obvious to me that the location and number of points of alcohol dispensation on a licensed premises implicate questions that have an impact upon the control of alcohol service to patrons, some of whom may become inebriants or may be minors. This is quintessentially the stuff of which Art. 2B speaks in many of its provisions. Licensees, as well as the Board, should have a reason to care about this as it complicates their oversight responsibilities for their employees who dispense alcoholic beverages.